[Civ. No. 425.  Third Appellate District.—April 13, 1908.]

MAUD FITE, Respondent, v. E. PERRY, Administrator of Estate of C. C. CARLTON, Deceased, Appellant.

GIFT CAUSA MORTIS—DELIVERY ESSENTIAL.—In order to complete a gift *causa mortis,* the delivery of the property to the donee, actual or symbolic, before the death of the donor, is essential. There must be something to distinguish it from an ordinary testamentary bequest, which is good only when proved as a will.

ID.—INEFFECTIVE GIFT.—Where the evidence shows that a gift by a dying person of horses, harness and a buggy was understood by the donee not to become effective, or to confer any right of possession before the death of the donor, the gift is ineffective, and the property belongs to the estate of the donor.

APPEAL from a judgment of the Superior Court of Lassen County.  F. A. Kelley, Judge.

The facts are stated in the opinion of the court.

Pardee & Pardee, for Appellant.

R. M. Rankin, and W. M. Boardman, for Respondent.

CHIPMAN, P. J.—Action to recover possession of certain two horses, two sets of harness and a buggy, alleged to be the property of plaintiff and wrongfully withheld by defendant.

The cause was tried by the court without a jury, and plaintiff had the judgment, from which defendant appeals on bill of exceptions.

The findings are made up largely of probative facts. The ultimate facts found which are controverted are the following: That deceased, on November 4, 1906, "being in contemplation of death, but of clear and sound mind, did give and grant to the said plaintiff the said property" (describing the property mentioned in the complaint); that "at the time the gift of said property was made to the plaintiff, as aforesaid, the said personal property was in the possession of said C. C. Carlton, and was situated in a barn and corral jointly used by him and one T. J. Kennedy." There is no finding that plaintiff took possession of the property prior to the death of decedent, or at all, but there is a finding of certain facts which the court probably treated as equivalent to taking possession of or relieving plaintiff from the necessity of taking actual possession. This finding is as follows:

"That after said gift was made to plaintiff by said C. C. Carlton, to wit: about the hour of eleven o'clock A. M. of said 4th day of November, 1906, plaintiff left the sick-room of said C. C. Carlton and went out to make arrangements to take said personal property; that plaintiff met said T. J. Kennedy and informed him that said C. C. Carlton had made such gift to her of said property, and said T. J. Kennedy thereupon said to plaintiff, 'I am glad of it; I would rather see you have it than anyone'; that plaintiff, being satisfied and understanding from his statements that said T. J. Kennedy would care for and hold said property for plaintiff, returned to the bedside of said C. C. Carlton and there remained until his death at about the hour of eight o'clock P. M. of said 4th day of November, 1906; that the said horses, and particularly one of them, was too fractious and dangerous to be handled and controlled by plaintiff personally."

As conclusions of law the court found that deceased, "in contemplation of death, on the 4th day of November, 1906, did give and grant to the said plaintiff the said personal property, and that said plaintiff ever since has been and still is the owner of said property, and entitled to the possession thereof."

It appeared that deceased was about seventy years old, and had been on intimate social relations with plaintiff's family

and was particularly attached to her in a friendly way; that he had been sick for some time and plaintiff was told he wanted her, and she went to him on November 4th. She testified: "He died about eight o'clock in the evening of the 4th of November, 1906, and I was with him nearly all the time. The time he made the gift to me was early in the morning, about 9 or 10 o'clock. I think he was in a dying condition, but perfectly in his right mind. . . . He seemed to realize that he was about to die." She was asked to state what was said by him in reference to the gift, and replied: "Why, the way the subject came up, he was upstairs and he was right on an angle to where his barn was where he kept these horses, and I looked out and says, 'You ought to see Prince and Doc.' Mr. Carlton says, 'How do they look?' I says, 'They look fine; they are playing.' Then he said—he gave them to me. Shall I say what he said? Mr. Boardman (plaintiff's attorney): Go ahead." Witness continuing: "He says, 'If I don't happen to get over this,' he says, 'I want you to have the buggy, horses and harness'; he says, 'Make arrangements and get them,' or 'and take them,' I wouldn't swear to that, either get or take." She further testified that he called the attention of Mrs. Packwood to what he had said; "called her by her given name twice, and I understood it and she did, as he wanted her to witness that he had given me the property." Mrs. Packwood was a friend of deceased and plaintiff, and was present and to some extent corroborated the testimony of plaintiff. The plaintiff further testified: "A few minutes after this conversation I went downstairs out into the street and met Mr. Kennedy, and I told him that Mr. Carlton had given me the team, buggy and harness. He said he had rather see me get them than anyone else, or some words to that effect. Mr. Kennedy is the man who had the buildings and butcher shop and tools rented from Mr. Carlton. Besides the premises known as the butcher shop there was a barn where Mr. Carlton kept his horses, and there was a back room on the premises that Mr. Carlton kept his things in and slept in there when he was in the town of Bieber. Mr. Carlton took care of his horses until he was sick—until he went to bed. Mr. Kennedy fed the horses for Mr. Carlton after he took sick. At that time Mr. Kennedy gave me to understand that he thought they were mine. Q. Then what did he give you to understand about the horses being there? A.

He gave me to understand he thought they were mine. I went back to the room. He asked me if I would stay with him when I first went in the morning, and I felt disposed to go back and attend the sick man. I left him for the purpose of going over to make arrangements about getting the horses or taking the horses as was stated by him. I went over to tell Mr. Kennedy. That conversation with Mr. Kennedy was within less than an hour after he gave me the property. That was before noon, and he died at 8 o'clock at night. I saw Mr. Kennedy the next morning and told him that I wanted the horses. He said I could have them, but he had nothing to do with them, something of that sort; and then I told him I would have some of the boys go up and get them and take them down to father's place, and he said all right. The horses were not safe for any woman to handle. In a short time I saw him again, and he told me I could not have them.''

On cross-examination she testified: ''Mr. Carlton stated to me that I was to have possession of the property in case he died, but did not give me any writing at that time. I had three interviews with Mr. Kennedy about the team. In the third one he refused to give me possession of the team. Q. Did Mr. Carlton have any children? A. Yes, sir. Q. How many? A. Well, I never saw but one of them. I heard he had four, though. Q. What were Mr. Carlton's exact words in reference to the gift? A. He says, 'If I don't happen to get out of this,' he says, 'the horses, buggy and harness are yours; make arrangements and get them,' or 'take them.' Q. Did he tell you any particular time? A. No, sir. Q. Didn't say you was to get them at that time? A. No, sir. He started to coughing and didn't say any more. Q. You understood, though, that you were not to have possession of the team unless he died? A. Yes, sir. Q. Did you consider then that you had any right to take possession of the team before his death? A. No, sir. Q. Why did you make that demand of Mr. Kennedy, then? A. I didn't make a demand. I understood that they were mine when he died, and we all knew he was going to die because the doctor had said there was no hopes. The Court: How did you understand it at the time that he told you he would give you the horses, harness and buggy; that he intended to transfer the possession from himself to you or not? A. No, I didn't

until after he died. Q. Then did you understand that he intended to make a complete gift to you? A. Yes, sir. Q. And that it would only be a short space of time before he died? A. Yes, sir.''

It may be assumed that the evidence was sufficient to justify the finding that the deceased intended to give the property to plaintiff should he not recover from his then sickness. But to complete this gift and make it effective it was necessary that there should be delivery to the donee, actual or symbolic, before the death of the donor. The principles governing gifts *causa mortis* are well stated in *Noble* v. *Garden,* 146 Cal. 225, [79 Pac. 883]. We quote briefly from authorities cited: ''In a gift *causa mortis* a written instrument is not necessary; it may be, and usually is, made by parol, and the possession of the thing given must be absolutely delivered to the donee before the death of the donor and the donee. . . . The most characteristic mark of distinction between a legacy and such a gift is the change of possession. From the nature of the *donatio,* it is apparent that the infallible test which must distinguish it from a testamentary gift is delivery, a change of dominion *in praesenti.* Without this there is really nothing to distinguish it from an ordinary testamentary bequest.'' (Thornton on Gifts, sec. 20, and cases cited.) In *Basket* v. *Hassell,* 107 U. S. 602, [2 Sup. Ct. Rep. 415], the question is fully treated and the cases collected. The court said: ''If the gift does not take effect as an executed and complete transfer to the donee of possession and title, either legal or equitable, during the life of the donor, it is a testamentary disposition, good only if made and proved as a will. . . . But there must be delivery of possession. The contract must have been executed. The thing given must be put into the hands of the donee, or placed within his power by delivery of the means of obtaining it. . . . Without delivery the transaction is not valid as an executed gift; and without consideration, it is not valid as a contract to be executed.''

Under these rules, what occurred between plaintiff and Kennedy after the death of Carlton is immaterial. When plaintiff informed Kennedy that Carlton had given her the property, she took no steps to reduce it to possession, nor did she request Kennedy to hold it for her, nor did he say he would do so. She did not even view the property at that time, nor did she report to Carlton that she had seen Kennedy. She

testified that she understood that she was not to take possession, and that she had no right to take possession before Carlton died. The court asked her whether she understood that Carlton intended to transfer the possession from himself to her or not, and she replied, "No, I didn't, until he died."

In view of the principles of law above stated, it seems to us quite clear that the evidence is insufficient to warrant the findings of the court.

The judgment is reversed.

Hart, J., and Burnett, J., concurred.